# 10-3709
## 10-4230

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



SDBC HOLDINGS, INC., f/k/a Stella D'oro Biscuit Co., Inc.,

*Petitioner-Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner.*

———————————

*On a Petition for Review and Cross Application for Enforcement
of a Final Order of the National Labor Relations Board*

## REPLY BRIEF
## FOR PETITIONER-CROSS-RESPONDENT

Mark A. Jacoby
Lawrence J. Baer
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Petitioner-Cross-Respondent*
767 Fifth Avenue
New York, New York 10153
212-310-8000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ........................................................................................ 2

    I.    THIS COURT'S DECISION IN *STROEHMANN* IS
        INDISTINGUISHABLE AND CONTROLLING HERE
        ON THE *TRUITT* ISSUE ........................................................ 2

    II.    THE GENERAL COUNSEL IGNORES THIS
        COURT'S CONTROLLING DECISION IN *ST.*
        *JOSEPH'S HOSPITAL* IN FRAMING THE ISSUE
        CONCERNING THE MANNER OF PRODUCING
        INFORMATION REQUESTED IN BARGAINING ............ 13

    III.    THE RECORD DOES NOT SUPPORT THE BOARD
        MAJORITY'S CONCLUSION THAT THE STRIKE
        WAS AN UNFAIR LABOR PRACTICE STRIKE ............... 24

CONCLUSION ...................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Cyanamid Co.*,
129 NLRB 683 (1960)............................................................14, 23

*American Telephone & Telegraph Co.*,
250 NLRB 47 (1980), *enforced sub nom. Communications
Workers of Am., Local 1051 v. NLRB*, 644 F.2d 923 (1st Cir. 1981)................19

*C-Line Express*,
292 NLRB 638 (1989)........................................................24

*Century Air Freight, Inc.*,
284 NLRB 730 (1987)........................................................23

*Detroit Edison Co. v. NLRB*,
440 US 301 (1979)............................................................14

*Facet Enterprises*,
290 NLRB 152 (1988)........................................................19

*Island Creek Coal Co.*,
289 NLRB 851 (1988)........................................................20

*Lakeland Bus Lines*, *Inc.*,
335 NLRB 322 (2001), *enforcement denied* 347 F.3d 955 (D.C.
Cir. 2003)......................................................................12

*Manitowoc Co.*,
186 NLRB 994 (1970)........................................................23

*Nielsen Lithographing Co.*,
305 NLRB 697 (1991)....................................................4, 9, 12

*NLRB v. St. Joseph's Hospital*,
755 F.2d 260 (2d Cir. 1985) ...........................................passim

*NLRB v. Truitt Mfg. Co.*,
351 U.S. 149 (1956)...................................................................................1, 2, 11

*Olivetti Office USA, Inc. v. NLRB*,
926 F. 2d 181 (2d Cir. 1991) ...............................................................20

*Stroehmann Bakeries, Inc. v. NLRB*,
95 F.3d 218 (2d Cir. 1996) .........................................................passim

*Torrington Extend-A-Care Employee Ass'n v. NLRB*,
17 F.3d 580 (2d Cir. 1994) ...............................................................11

*Union Switch & Signal, Inc.*,
316 NLRB 1025 (1995)....................................................................19

*United Stockyards*,
293 NLRB 1 (1989)............................................................11, 12, 13

*Yakima Frozen Foods*,
130 NLRB 1269 (1961), *enforced sub nom. Fruit & Vegetable*
*Packers & Warehousemen Local 760 v. NLRB*, 316 F.3d 389 (D.C.
Cir. 1963).......................................................................................17, 23

## SECONDARY AUTHORITY

Brief for the NLRB, *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955
(D.C. Cir. 2003) (Nos. 02-1260 & 02-1302).....................................13

## PRELIMINARY STATEMENT

In its opening Brief, the Company identified up front – in its Statement of Issues – the two decisions of this Court that constitute controlling precedent on the respective two major issues of law that should determine the outcome of this case:  (i) the distinction under *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149 (1956), between a bargaining claim of *inability to pay* and a claim of *unwillingness to pay*; and (ii) the nature of the duty to bargain in good faith over the *manner* of providing financial information deemed relevant in bargaining.

As we explain below, the NLRB General Counsel resorts to an inexplicable misstatement of the facts of the controlling Second Circuit authority on the first issue, *Stroehmann Bakeries, Inc. v. NLRB*, 95 F.3d 218 (2d Cir. 1996), in a futile effort to distinguish the case – a misstatement that is in conflict with what the Board majority here itself said about *Stroehmann*.

Just as remarkably, the General Counsel says absolutely nothing about the controlling Second Circuit authority on the second issue, *NLRB v. St. Joseph's Hospital*, 755 F.2d 260 (2d Cir. 1985).  Thus, Petitioner's contention that reversal of the decision below also is mandated by that decision stands unrebutted.

Finally, substantial objective evidence supports the conclusion that the strike in the instant case was an economic strike, and the Board majority's conclusion that it was an unfair labor practice strike is not supported by substantial evidence on the record as a whole.

## ARGUMENT

I. **THIS COURT'S DECISION IN *STROEHMANN* IS INDISTINGUISHABLE AND CONTROLLING HERE ON THE *TRUITT* ISSUE**

As detailed in Petitioner's opening Brief (at 29-30), the Company not only never *expressly* pled "inability to pay" in bargaining, but its statements to the Union could not have been reasonably interpreted as delivering such a message. The Company's pitch to the Union bargaining committee from the outset of negotiations was straightforward and transparent. Stella had been purchased in 2006 by financial investors, who knew when they made the purchase that the Company was a "distressed asset" that had suffered declining sales for years and was not profitable. These financial investors had continued to invest in the business – providing working capital and purchasing new equipment – but it was their conviction that labor cost concessions were needed together with other actions to achieve a successful turnaround. Their two business strategy options were: (i) to try to do what was called for to make Stella profitable so they could eventually resell it at a

higher price as a going concern; or (ii) shut the operation down and sell its valuable assets in pieces.

Company negotiators did not themselves have to spell out these two business options; a rank and file worker, Mike Filippou, who served on the Union bargaining committee, said it for them at a key bargaining session.[1] He observed that the Company's owners could make a nice profit by closing the plant and selling both the Stella D'oro brand and the choice real estate where the plant was located, but they were looking to make a larger profit by obtaining labor cost concessions that would enable them to sell the business as a profitable going concern. SPA17. Henk Hartong, the non-executive Chairman of Stella and a managing director of Brynwood Partners, acknowledged to the Union bargaining committee that Mr. Filippou accurately described the two business options available to the owners – pointing out that Brynwood could have followed the "close and sell" strategy from the date they purchased Stella in 2006, but the funds they had continued to invest in the Company demonstrated that their preference was

---

[1] This was the same bargaining session in which the Union President announced that she had changed her mind and was not going to have the Union lawyer or accountant visit the Company lawyer's office to review the Company's audited 2007 Financial Statements, as twice previously agreed. SPA2,9,17; A71-72.

to succeed with the turnaround strategy that would enable the business to be sold eventually as a profitable going concern with continued employment for the workers there. *Id.*

There was thus no mistaking the fact that Stella's bargaining position was never about the Company's "ability to pay," it was entirely about what labor concessions were needed to induce the Company's investor-owners to continue to fund a turnaround business plan for the Company. In the words of *Nielsen*, this was a classic case of what the employer was "willing to pay," not what it was "able to pay." *Nielsen Lithographing Co.*, 305 NLRB 697, 700 (1991). The NLRB General Counsel acknowledges in his Brief that it is "the substance of the employer's bargaining position, not the formal words used" that control. G.C. Br. at 24 (quoting *Rivera-Vega v. Con Agra, Inc.*, 70 F.3d 153, 154 (1st Cir. 1995)). Yet the General Counsel's Brief focuses almost entirely on bargaining rhetoric – "survival," "stay in business," "get rid of the business," etc. – often misquoting or exaggerating the testimony or how it was described in the Board majority and ALJ decisions.[2] The General Counsel mischaracterizes the substance of the

---

[2] For example, the General Counsel turns a quote from the Board majority decision that the Company "may have to close" into "would 'have to close.'" G.C. Br. at 7 (citing SPA1; A96). Similarly, the General Counsel asserts that the Union asked for "financial documentation supporting the

4

Company's bargaining position in similarly "ominous," alarmist terms,

without placing it in the *context* of the two business strategy options

discussed at the bargaining table:

> The Company came to the bargaining table to
> deliver an ominous and oft-repeated message: the
> Union had to agree to significant labor concession
> or else it faced the Company's imminent demise.
>
> . . .
>
> Throughout the negotiations, the Company
> portrayed its business as teetering on the edge of
> closure, with labor cost concessions being the only
> safeguard against its otherwise unavoidable
> demise.

G.C. Br. 26-27. The Board majority's own findings, however, establish that

this was not a Company teetering on the edge of its demise because of a

shortage of cash. Stella's investor-owners were not trying to bleed the

Company dry and have it suffer a resulting demise. They had been pursuing

a turnaround strategy with additional investments in the Company since the

2006 purchase and were able and willing to continue to invest funds in the

Company for this purpose. But they also had the option to switch at any

---

Company's claim that it needed concessions *in order to stay in business,*"
G.C. Br. at 9 (citing SPA15), but the ALJ decision cited states that the Union
asked for "financial documentation which supported the Employer's level of
concessions requested." SPA15 (emphasis added). This pattern of
mischaracterization occurs throughout the General Counsel's brief.

time to a close-and-sell strategy if the turnaround strategy proved

unsuccessful.  In substance, they were seeking to induce the Union to join

them in following the first option, by agreeing to a labor cost restructuring

that made sense based upon the shrunken size of Stella's business.  It was an

option that would mean reduced pay and benefits for the represented

workers – but continued employment, contrasted with the almost certain loss

of employment if Brynwood was dissatisfied with the progress towards a

turnaround, and went to the second option, a sale of the assets in pieces.

Those are not choices between good and evil, they were simply the

commercially viable options presented when Kraft chose to sell this

unprofitable business to Brynwood rather than itself fix or close the

business.

        This is a case which is "on all fours" with *Stroehmann Bakeries, Inc.*

*v. NLRB*, 95 F.3d 218 (2d Cir. 1996), where this Court ruled that statements

in bargaining about Stroehmann's access to capital from its "deep-pockets"

parent company – which was able and willing to provide funding for the

subsidiary if satisfactory labor cost concessions were negotiated – meant that

Stroehmann's statements concerning its own severe operating losses and dire

financial condition could not be reasonably interpreted as conveying an

inability to pay.  *Id.* at 222-23.  Disregarding the essential commonality of

the employer's statements in bargaining in *Stroehmann* and here, the
General Counsel's Brief offers two putative distinctions: (i) "[i]n
*Stroehmann*, the employer outright denied that it was claiming an inability to
pay"; and (ii) "in *Stroehmann*, the employer's access to those [the parent
company's] deep pockets was not contingent upon any labor concessions."
G.C. Br. at 35.

We have already addressed the first point in Petitioner's opening Brief
(at 37-39). There was no reason for the Company to "deny" in bargaining
something that it was never accused in bargaining of having done. The issue
did not come up at all in bargaining because the Company never claimed
inability to pay, and the Union never accused it of doing so. The issue only
was raised by implication when the Union filed an unfair labor practice
charge (A249) *long after* the parties had reached an impasse in negotiations
and the Union called a strike. It was only after the union filed that unfair
labor practice charge that the employer had any reason to deny the
allegation, and it did so then. Elementary logic indicates that an express
denial or failure to deny might have some probative value only in direct
*response* to an accusation that conceivably might call for one. That occurred
in *Stroehmann* during bargaining (95 F.3d at 221); but here it did not occur
until much later.

7

The second putative distinction offered by the General Counsel is
shown to be erroneous on the face of the Board majority's opinion below.
The General Counsel asserts:

> "[I]n *Stroehmann,* the employer's access to those
> [the parent company's] deep pockets was not
> contingent upon any labor concessions."

G.C. Br. at 35. However, the Board majority below, describing *Stroehmann*,
stated (SPA3):

> "that [deep-pockets] parent expected the employer
> to stand on its own and would not continue to fund
> the employer's losses without labor-cost
> concessions."

Suffice it to say, the General Counsel misstated the facts in
*Stroehmann*. In both *Stroehmann* and the instant case, the deep-pockets
parents that were providing the capital to fund the severe losses of their
subsidiaries were conditioning continued funding on labor cost concessions.
That is precisely why the subsidiary's own ability to fund losses was deemed
irrelevant to the negotiations in *Stroehmann*, and should be deemed
irrelevant here, as well.

Having misstated the facts in *Stroehmann*, the General Counsel rests
heavily on the false distinction he created. Indeed, an entire subsection of
the General Counsel's Brief is devoted to this point, labeled "Brynwood's

8

pocketbook came with strings attached." G.C. Br. at 33-35. Our response is: Yes, of course, but so what? The General Counsel never grapples with this analytical gap in reasoning.

As *Stroehmann, Nielsen*, and numerous other authorities all make clear, the reason for the dichotomy drawn between cases in which the employer is claiming inability to pay and those in which it is claiming unwillingness to pay is to distinguish between those cases in which the employer's financial records may contain information relevant to bargaining and those in which those financial records are not relevant and therefore the employer need not agree to make them available to the union. *See Stroehmann*, 95 F.3d at 218 ("The Board and the courts must take care that financial information demanded by a union be reasonably related to the rationalization of bargaining."); *Nielsen*, 305 NLRB at 700 (claims of "can't pay" are different from "does not want to pay," because with the former, "[i]f it is proven, the union will be faced with the reality that the 'well has run dry.'"). As *Stroehmann* holds, where the employer has access to an alternative source of funding, the union's need to review any of the employer's own financial books and records becomes "virtually non-existent." 95 F.3d at 223.

9

Similarly, the General Counsel, like the Board majority below, completely misconstrues the significance of the undisputed evidence that Brynwood:

- Was providing Stella with working capital in the face of continuing operating losses;

- Had invested over $3 million in new automated packaging equipment; and

- Proposed to the Union a change in pension programs in order to reduce labor costs over the long-term, but which would trigger an immediate assessment against the Company of a $6 million ERISA withdrawal liability which the Company would have to meet.

*See* Pet. Br. at 29-30. These facts served to confirm that Stella's own current "ability to pay" was *not* germane to the bargaining calculus since the funding to run the business and achieve the turnaround was coming from elsewhere. Yet the General Counsel, quoting the Board majority below, asserts: "Brynwood's expenditures '*cut both ways,* as much suggesting preparations for selling the business as for continuing it on a profitable basis.'" G.C. Br. at 34 (emphasis added). Manifestly, Brynwood's past and proposed funding of Stella *does not* "cut both ways" at all on the pertinent question – which is the lack of relevance of Stella's own assets to fund the business. The fact that "the Company's access to Brynwood's capital reserves came with strings attached" only serves to buttress the conclusion

10

that it was Brynwood's willingness to pay – or not – that was dictating the Company's bargaining position.

Unable to either distinguish this Court's decision in *Stroehmann* or provide some other logical reason for disregarding the economic realities rendering Stella's own funding ability irrelevant to bargaining, the General Counsel, like the Board majority below, seeks to rest on *United Stockyards*, 293 NLRB 1 (1989), a 1989 Board decision that this Court previously discredited in *Torrington Extend-A-Care Employee Ass'n v. NLRB*, 17 F.3d 580, 589 (2d Cir. 1994) as an example of a pre-*Nielsen* case that was decided on a much broader reading of *Truitt* than has been permitted post-*Nielsen*. As Petitioner observed in its opening Brief (at 36-37), the Board's reversal of the ALJ in *United Stockyards* was based upon the ALJ's factual error in mistakenly attributing statements made in bargaining about the employer's troubled financial condition to the parent, which was a profitable operation. The General Counsel acknowledges that "the Board corrected the [ALJ's] error," but asserts that this "had no effect on the Board's holding." G.C. Br. at 33 n.4. However, a reading of *United Stockyards* makes plain that the correction, in fact, was the precise basis for the Board's holding there. 293 NLRB at 2-3.

11

Even more importantly, the General Counsel makes no effort to reconcile the Board majority's attempted resurrection of *United Stockyards* as a putative basis for disregarding Brynwood's "deep-pockets" with the reasoning of this Court in *Stroehmann* that "[o]nce Stroehmann conceded that it had access to capital [from its deep-pockets parent] . . . the Union's need for financial information [about Stroehmann] to bargain intelligently was virtually non-existent." 95 F.3d at 223.

The lack of consistency in the Board's treatment of these issues is reflected most clearly by the Board's stated distinction of *Stroehmann* in its decision in *Lakeland Bus Lines*, *Inc.*, 335 NLRB 322, 325 (2001), *enforcement denied* 347 F.3d 955 (D.C. Cir. 2003). There, the Board cited the employer statements in *Stroehmann* concerning its deep-pockets parent as the specific rationale for distinguishing the facts in *Stroehmann* from the facts in *Lakeland*. There was no suggestion by the Board in *Lakeland* that *United Stockyards* still ruled from the grave in which it was put to rest by the Board's own decision in *Nielsen*.[3] 335 NLRB 322. Noteworthy, too, is the

_____

[3] The General Counsel exhibits the same lack of consistency in his briefs filed with the Circuit Courts. In *Lakeland*, the General Counsel, arguing to the D.C. Circuit, similarly sought to distinguish *Stroehmann* from *Lakeland* on the specific grounds that the employer in *Stroehmann* had cited its "parent corporations 'deep pockets'" as its available source of funding. *See*

fact that there is no mention of *United Stockyards* in the Board's own *Stroehmann* decision, in the ALJ decision in the instant case, or in the General Counsel's briefs to the Board in the instant case. The idea to rely upon an out-of-context "soundbite" from the Board's moribund decision in *United Stockyards* as the linchpin of the Board majority's legal analysis here comes *sua sponte* from Chairman Liebman and Member Pearce. There is, of course, no way to reconcile the Board majority's reliance upon *United Stockyards* with this Court's decision in *Stroehmann*, and *Stroehmann* dictates that the decision below be set aside in its entirety.

## II. THE GENERAL COUNSEL IGNORES THIS COURT'S CONTROLLING DECISION IN *ST. JOSEPH'S HOSPITAL* IN FRAMING THE ISSUE CONCERNING THE MANNER OF PRODUCING INFORMATION REQUESTED IN BARGAINING

Assuming, *arguendo*, this Court concluded that its decision in *Stroehmann* does not compel reversal of the Board majority's conclusion that the Company claimed inability to pay in bargaining, the Court would then have to reach the question of whether Stella failed to bargain in good faith over the manner of making available to the Union, as requested, its audited 2007 Financial Statements.

---

Brief for the NLRB at 23 n.6, *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955 (D.C. Cir. 2003) (Nos. 02-1260 & 02-1302).

As Petitioner observed in its opening Brief (at 49-50), it is well-settled that if the employer has a duty to make available financial information requested by the Union, the employer is not required to make the information available in the *manner* sought by the Union, but must bargain in good faith to seek a mutually acceptable accommodation with the Union over the manner of satisfying the information request. *Detroit Edison Co. v. NLRB*, 440 US 301, 314 (1979); *Am. Cyanamid Co.*, 129 NLRB 683, 684 (1960).

We reiterate here, the legal standard as framed by this Court in *St. Joseph's Hospital*:

> [P]resentation of *bona fide* concerns by the Company [such as concerns about disclosure of its confidential financial information], coupled with reasonable proposals designed to satisfy the needs of the Union and to achieve a mutually satisfactory resolution of the Union request, is simply not a refusal to bargain. On the contrary this is precisely the conduct the Labor Act is designed to foster.

755 F.2d at 265 (quoting *Shell Oil Co. v. NLRB*, 457 F.2d 615, 620 (9th Cir. 1972)).

In the instant case, there can be no dispute that the Company's concern about providing the Union with a photocopy of its non-public financial statements was *bona fide*. As the ALJ expressly found, and the

14

Board majority agreed, the Company articulated to the Union "legitimate concerns" that a copy of the Company's audited 2007 Financial Statements not intentionally or inadvertently fall into the hands of competitors, vendors or suppliers. SPA5-6,26. Further, the Company made a reasonable proposal to make the document available to both the Union and its advisors for unsupervised study and notetaking at caucuses during the bargaining sessions, as well as at the Stella plant office in the Bronx, and at the Company attorney's office in midtown Manhattan – which was in close proximity with both the Union attorney's office and its independent CPA's office. SPA11,25.

Contrary to the General Counsel's assertion,[4] there was *no* finding by the ALJ or the Board majority that this was an "unreasonable" or "unduly burdensome" proposal, nor could such a finding be made on the facts presented or under applicable law. First, the very fact that the Union twice agreed to this proposal at two successive bargaining sessions (SPA16-17), by indicating it would have one of its advisors visit the Company's

---

[4] A subsection of the General Counsel's brief (at 39-42) is labeled "The Company's proposed alternative subjected the Union to an unduly burdensome procedure," but its contents are devoid of any reference to a finding by the Board majority or ALJ that the Company's proposal was "unreasonable" or "unduly burdensome."

attorney's office – and then simply reneged on this agreement – itself is probative that the Company's proposal was reasonable. The Company attorneys' office was only a quick subway or taxi ride away from both the Union attorney's office and the office of its independent CPA. Second, the Union actually brought its attorney to a bargaining session held in December after the strike began and long after it reneged on its twice-made agreement with the Company. The Company provided the Union attorney there with a copy of the audited 2007 Financial Statements to study and take notes during the bargaining caucuses, which he acknowledged he had successfully completed by the time the bargaining session ended. SPA20. This further confirms that the Company's proposal had been reasonable.[5] Third, it is quite common when an employer's confidential financial documents are deemed relevant in bargaining for those financial documents to be made

---

[5] Indeed, the Union attorney's presence at the bargaining table in December only raises a question as to the motivation of the Union in not bringing its attorney to any earlier bargaining session, prior to the impasse and strike, when he could have reviewed the financial document in a more timely manner. The likely hypothesis is that the Union realized that looking at Stella's Financial Statements simply was not going to be of any help to the Union in bargaining; the Union President already had confirmed with her own eyes that the Company's operating loss in 2007 as stated on the Company's audited Statement of Operations was over $1.5 million. SPA9,11,16; A163-64,236. Or perhaps, as the Court speculated might have been the situation in *Stroehmann*, the Union was simply looking to "create a legal issue" for possible later use. 95 F.3d at 223.

available for inspection by union representatives at the employer's premises. The litigated cases typically involve disputes over *other* restrictions that the employer seeks to impose as a condition of the review of confidential financial information. *See*, *e.g.*, *Yakima Frozen Foods*, 130 NLRB 1269, 1270-73 (1961), *enforced sub nom. Fruit & Vegetable Packers & Warehousemen Local 760 v. NLRB*, 316 F.3d 389 (D.C. Cir. 1963) (employer specified that review of financial records be done at employer's office, but union objected to condition that it engage a CPA to conduct review and that any questions be directed to employer's accountant; Board held the employer's offer was "a reasonable one" and thus the employer did not violate its statutory duty to bargain in good faith). The fact that it is a common practice for a union to review confidential corporate financial documents at the employer's premises establishes, as a matter of law, that Stella's proposal – offering an opportunity to inspect the document at three different possible locations and without any other restrictions – was reasonable.

The General Counsel, like the Board majority below, fails to apply the legal standard quoted above from *St. Joseph's Hospital* to the undisputed facts presented here. Indeed, the General Counsel not only completely disregards *St. Joseph's Hospital*, but his Brief fails to articulate and support

17

the proper legal standard governing what constitutes a failure to bargain in good faith over the *manner* of making available information required for bargaining. Instead, the General Counsel, like the Board majority relies entirely upon two inapposite lines of cases, each dependent upon unique facts not presented here.

In one line of cases relied upon by both the General Counsel and the Board majority below, the employer has raised *no* legitimate confidentiality concerns (or the Board had made a finding that a stated confidentiality concern was actually "specious") and the employer is seemingly just forcing the union to jump "through the hoops" in refusing to provide photocopies of documents requested in bargaining or for grievance administration. In these cases, the Board typically cites the negligible cost and inconvenience to the employer in making photocopies, and the volume and complexity of the information,[6] in concluding that the employer had violated its duty to

---

[6] In an effort to fit within this inapposite line of cases, insofar as the volume and complexity of the information is a factor, the General Counsel engages in extremes of hyperbole in describing the Company's audited 2007 Financial Statements. For example, he asserts that the document contains "numerous complex calculations" (G.C. Br. at 19), when, in fact, the only calculations shown are simple addition and subtraction. A357-60. He further asserts that it contains "spreadsheets" (G.C. Br. at 21), a misnomer if he is referring to the balance sheet and three other pages that contain the essential financial data. A357-60. Indeed, as noted in Petitioner's opening brief (at 56) only one page of the document – the Statement of Operations

18

bargain in good faith.  *See* G.C. Br. at 39-41.  Exemplars of this line of cases are *American Telephone & Telegraph Co.*, 250 NLRB 47 (1980), *enforced sub nom. Communications Workers of Am., Local 1051 v. NLRB*, 644 F.2d 923 (1st Cir. 1981); *Union Switch & Signal, Inc.*, 316 NLRB 1025 (1995); and *Facet Enterprises*, 290 NLRB 152 (1988).  None of these cases is apposite here where the ALJ and Board found that a legitimate confidentiality concern had been raised by the Company.

The other line of cases improperly relied upon by the General Counsel and the Board majority below involves the circumstance where the employer refuses to make specified relevant financial information available *at all* to the union because of confidentiality concerns, even if the Union is willing to enter into a confidentiality agreement.  In such cases, the employer is found to have failed to bargain in good faith because, by definition, the employer

---

(A358) – contains information about the calculation of Stella's 2007 operating loss, the one item of financial information that the Union President stated was needed "in order to prove that the Employer was, in fact, losing the amount of money represented."  SPA14.  The Statement of Operations has only 15 line items, four of which are simply addition or subtraction of the line items above.  A358.  The General Counsel's assertion that the Union "needed" other financial information, too – such as the amount of its "intangible assets" – is not only contradicted by the findings in the decisions below (SPA 15), but reflective of the General Counsel's own apparent lack of familiarity with financial statement items.  It is inconceivable that the amount shown on a financial statement for "intangible assets" could have any relevance in labor negotiations.

19

has not made any proposal – reasonable or otherwise – to grant the union access to the information found relevant to bargaining or grievance administration.  Exemplars of this line of cases are *Olivetti Office USA, Inc. v. NLRB*, 926 F.2d 181 (2d Cir. 1991) and *Island Creek Coal Co.*, 289 NLRB 851 (1988).

What the Board majority did here was to effectively turn the proper framework for legal analysis as set forth in *St. Joseph's Hospital* on its head. The Board majority should have concluded that Stella had *not* failed to bargain in good faith because it had articulated a legitimate confidentiality concern about furnishing the Union with a photocopy of its non-public financial document, and had made a reasonable proposal to make the document available for examination and notetaking by both the Union and its professional advisors at several sites.  Instead, the Board majority proceeded to find a violation of the duty to bargain based upon an impermissible, *subjective weighing* of the merit of the Company's proposal against the merit of a proposal put forth by the Union.  The Union had offered to sign a confidentiality agreement if the Company provided it with a photocopy of the financial document.  The Company rejected this proposal based upon the stated *bona fide* grounds that such agreements were

problematic to enforce, particularly because of the absence of an effective remedy in the event of a breach.  SPA26.

The Board majority expressed the view that the Union had "met" the Company's legitimate confidentiality concern by offering to sign a confidentiality agreement, in the absence of proof by the Company "that the Union could not be expected to honor such an agreement."  SPA5.  Needless to say, that would set an extraordinarily high bar for any employer to overcome.[7]  It was the *risk* of an intentional or inadvertent breach, coupled with the absence of an effective remedy in the event of a breach – clearly *bona fide* concerns – that were Stella's reasons for rejecting the Union's proposal.  SPA26.  Stella's new management and attorney had no prior experience with this Union (SPA13), and thus were not in a position to assess the degree of risk, let alone *prove* that the Union was likely to breach a confidentiality agreement.

The Board majority then went on to weigh the strength of Stella's confidentiality concern, scoring it to be "weak," ironically because the Company already had given the Union and its employees a one page

---

[7]  The Board majority erroneously cites for this proposition cases falling within the two inapposite lines of cases discussed in the text above.  *See supra* at 18-20.

21

summary breaking down its $1.5 million operating loss.  SPA6.  It appears

that the Board majority failed to examine the contents of the Company's

audited 2007 Financial Statements, which was made an exhibit in the

hearing record, because the Board majority adopted the ALJ's statement

that "this summary showed the exact amount of Stella's loss, 'the main item

[Stella] sought to conceal from its vendors, customers, and competitors.'"

SPA6.  Examination of the Statement of Operations in the Financial

Statements (A358) would have revealed to the Board majority that the

"exact amount" of Stella's *net* loss in 2007 was over $3.3 million, more than

double the $1.5 million operating loss shown on the one-page summary

presented to the Union in negotiations.  There was absolutely no factual

basis whatsoever for the ALJ and Board majority's assertion that the

*operating* loss was the "main item" it sought to conceal from its vendors,

customers, and competitors.  Disclosure of the net loss, rather than the

operating loss, and the fact that cash on hand had dropped from $2.8 million

to $300,000 during 2007 would have been far more problematic to the

Company in terms of the perception of its credit worthiness.  *See* Pet. Br. at

50-51n.3.

The Board majority's conclusion is not only unsupported by and

inconsistent with the facts, under governing law the Board majority should

not have engaged in such a subjective evaluation of the relative merit of the parties' respective proposals. More than 50 years ago the Board laid down the rule that "the conditions under which access" is to be given to a union to preserve the employer's confidentiality concerns "is a matter more properly to be resolved at the bargaining table than through Board processes." *Am. Cyanamid Co.*, 129 NLRB at 684.

Under the legal standard articulated by this Court in *St. Joseph's Hospital,* Stella satisfied its duty to bargain by making a reasonable proposal allowing for the Union to examine the requested information. Stella was under no obligation to agree to a different proposal advanced by the Union. Indeed, employer proposals with far greater restrictions than those presented by Stella's proposal here, have been approved by the Board and the Courts as satisfying the statutory duty to bargain in good faith. *See, e.g.*, *Yakima Frozen Foods*, 130 NLRB 1269 (1961), *enforced sub nom. Fruit & Vegetable Packers & Warehousemen Local 760 v. NLRB*, 316 F.2d 389 (D.C. Cir. 1963); *Manitowoc Co.,* 186 NLRB 994, 994, 1006 (1970); *Century Air Freight, Inc.*, 284 NLRB 730, 734 (1987).

In finding that Stella violated the statutory duty to bargain based upon the Board majority's subjective evaluation of the relative merit of the respective proposals made by the parties, the Board majority here committed

23

plain legal error in contravention of the legal standard articulated by the

Second Circuit in *St. Joseph's Hospital*.  Accordingly, if the Court finds it

necessary to reach this question, the Board majority's decision should be set

aside in its entirety on these grounds.

## III.   THE RECORD DOES NOT SUPPORT THE BOARD MAJORITY'S CONCLUSION THAT THE STRIKE WAS AN UNFAIR LABOR PRACTICE STRIKE

If the Court does not set aside the Board majority's decision under

either of Petitioner's first two points, it will need to reach the third contested

point:  whether the strike the Union commenced in August 2008 was an

unfair labor practice strike.  As the Petitioner noted in its opening Brief (at

59), the Board itself has stressed in the past that in examining the purpose of

a strike, "the Board and the Court must be wary of self-serving rhetoric of

sophisticated union officials and members inconsistent with the true factual

context."  *C-Line Express*, 292 NLRB 638, 638 (1989) (quoting *Soule Glass

Co. v. NLRB*, 652 F. 2d 1055, 1080 (1st Cir. 1980)).  But as the General

Counsel's Brief confirms (at 54-55), the only proof offered to support the

contention that the strike in this case was an unfair labor practice strike was

just such self-serving rhetoric – and nothing else.  There were no written

communications to the Union members, no written communications to the

Company, no written communications to the public – no evidence other than

testimony by Union officials and a single member about what allegedly was said in a Union meeting where no recording or notes were made. The Union President, who supposedly addressed the assembled bargaining unit on both the terms of the Company's detailed final offer and the subject of the Company's failure to provide the Union with proof that it was losing money, could not even offer any notes that she used to make her presentation to the members. So the only evidence in the record is self-serving rhetoric about what was supposedly said at a Union meeting and even that rhetoric is inconsistent.

The Union President testified that she told the Union members at the July 26 unit meeting that the Company had, in fact, offered to have the Union and its advisors review the financial documentation supporting the Company's claim that it was losing money at "the Company's office," but "we didn't think that that was sufficient." A90. However, Union member Mesfun Kahssay testified that the Union President said at the July 26 meeting that "the Union asked them [the Company] to provide us verification or proof of evidence about losing money. And the Company refused to provide it." A140. Mr. Kahssay also was the sole Union member to testify that he went on strike to protest the Company's alleged refusal to provide the Union with evidence it was losing money. Not one single other

25

Union member among the 130+ bargaining unit members testified that he or she went on strike over this issue.

Remarkably, the General Counsel says very little about the substantial, objective evidence in the record demonstrating that the strike was *not* caused, in whole or in part, by the Company's failure to provide the Union with a photocopy of its audited 2007 Financial Statements. Regarding the Union's written strike notices to the Company, the General Counsel asserts that "the strike notices did reference, albeit implicitly, the Company's unfair labor practice." G.C. Br. at 57. This assertion more than strains credulity as there is no suggestion in the words used in the strike notices to support this bald assertion. *See* A344-45. Next, the General Counsel asserts that while the Union's strike flyers and picket signs do not reference the alleged unfair labor practice, this is mere advertising and the Company's alleged failure to provide financial documentation is not "glitzy" enough to warrant publicity. G.C. Br. at 57-58. Of course, while the absence of any such reference to an alleged unfair labor practice in strike materials may not be conclusive evidence that this was not an unfair labor practice strike, it certainly is probative on the point. Moreover, the General Counsel's "lack of glitz" argument actually provides a persuasive reason to discount Mr. Kahssay's testimony as to the reasons he went on strike. What

hourly wage earner would give up the paycheck he needs to put bread on the table in protest of the Company refusing to provide the Union with a photocopy of a document it had shown to the Union and offered to make available for future examinations at three different convenient locations?

Regarding the fact that the initial and amended unfair labor practice charges, both signed and sworn to by the Union's attorney, described the strike as an "economic strike" (A249-50), the General Counsel's only response is that a charge is "merely an allegation" and these two charges eventually were superseded by the Second Amended Charge that recharacterized the strike as an "unfair labor practice strike." A251. For the General Counsel of a government agency to ask a court to disregard as "immaterial" sworn statements by a charging party's attorney on a disputed issue of fact in a case his office is prosecuting, is nothing less than shocking – especially since the asserted "superseding" Second Amended Charge was solicited from the Union attorney by the General Counsel's office on the eve of the ALJ hearing to conform to the Amended Complaint prepared and filed by the General Counsel on the same day. *Compare* A251 *with* A252-58.

Finally, and perhaps most significantly, the General Counsel fails to address, let alone explain away, the fact that in a speech delivered during the strike by the Union President to a mass rally on Labor Day 2008, before it

filed any unfair labor practice, she expressly acknowledged that the Company had met its bargaining obligations under the Act – "flying under the NLRB radar screen."  *See* Pet. Br. at 61.

In sum, the binding admissions against interest made by the Union President and its attorney, together with the other cited evidence as well as the inconsistencies in the testimony concerning the Union unit meeting, compel the conclusion that the Board majority's finding that the instant strike was an unfair labor practice strike is not supported by substantial evidence on the record as a whole, and should be set aside.

## CONCLUSION

For all of the foregoing reasons, and those set forth in the Petitioner's opening Brief, Petitioner respectfully requests that the Court grant its Petition for Review, set aside the Board's decision and deny the Board's Cross-Application for Enforcement of its Decision and Order.

Dated: May 25, 2011

Respectfully submitted,

/s/ Mark A. Jacoby
Mark A. Jacoby
Lawrence J. Baer
Weil, Gotshal & Manges LLP
*Attorneys for*
*Petitioner-Cross-Respondent*
767 Fifth Avenue
New York, NY 10153-0119
(212) 310-8000 (phone)
(212) 310-8007 (fax)

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **PETITIONER-CROSS-RESPONDENT'S REPLY BRIEF** complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii). Exclusive of the exempted portions of the Brief, as providing in Fed. R. App. P. 32(a)(7)(B)(ii), this Brief includes 6,334 words. This Brief has been prepared in proportionately-spaced typeface using Microsoft Word in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(a)(7)(C), I have relied upon the word count of this word-processing system in preparing this certificate.

Dated:      May 25, 2011

/s/ Mark A. Jacoby
Mark A. Jacoby

**Prepared by PrintingHouse Press, Ltd. 10 East 39th Street, New York, NY 10016**

**Tel No: (212) 719-0990 Fax No: (212) 398-9253**

STATE OF NEW YORK   )

COUNTY OF NEW YORK  ) SS

Dave Jackson, Being duly sworn, deposes and says that deponent is not party to the action, and is over 18 years of age.

That on 5/25/2011 deponent caused to be served 2 copy(s) of the within

**Reply Brief for Petitioner-Cross-Respondent**

upon the attorneys at the address below, and by the following method:

**<u>By Federal Express Overnight
Delivery</u>**

**Elizabeth A. Heaney**
**National Labor Relations Board**
**Attorneys for Respondent-Cross-**
**Petitioner**
**1099 14th Street, NW**
**Washington, DC 20570**
**202-273-2960**

<table>
<tr>
<td>

**Sworn to me this**

Wednesday, May 25, 2011

ALLISON R. WADE
Notary Public, State of New York
No. 01WA6191434
Qualified in New York County
Commission Expires 8/11/2012

</td>
<td>

**Case Name:** SDBC Holdings v. National Labor Relations
Board

**Docket/Case No
(Index):** 10-3709; 10-4230

</td>
</tr>
</table>